KIMBALL *v.* BANGS.

1. CORPORATIONS—STOCKHOLDERS' SUIT—ISSUES TRIABLE.

In stockholders' suit for accounting, receiver for domestic and affiliated foreign corporation and distribution of assets, while issue as to rights of intervening purchasers of stock of domestic corporation might more appropriately have been tried in a separate plenary suit where the issue was not seasonably raised and not joined until the hearing had progressed to great length at great cost to the parties, determination to proceed to final determination thereon was proper.

2. SAME—INTERVENTION—DERIVATIVE STOCKHOLDERS' SUIT.

In stockholders' suit for accounting, receiver for domestic and its affiliated foreign corporations and distribution of their assets, the intervention of purchasers of stock of the domestic corporation after sale of practically the entire assets thereof by cross bill against previous purchasers of such assets constituted a derivative suit by stockholders on behalf of the domestic corporation.

3. APPEAL AND ERROR—CHANCERY CASE—STOCKHOLDERS' SUIT—DE NOVO REVIEW.

A stockholders' suit for accounting, receiver and distribution of corporate assets, being a chancery proceeding, is heard *de novo.*

REFERENCES FOR POINTS IN HEADNOTES

[1–27] 13 Am. Jur., Corporations, §§ 461–471.
[3] 13 Am. Jur., Corporations, § 451.
[5] 13 Am. Jur., Corporations, §§ 889–906.
[6, 7] 50 Am. Jur., Stipulations, § 11.
[6, 7] Relief from stipulations. 161 A.L.R. 1161.
[8] 3 Am. Jur., Appeal and Error, §§ 246–258.
[11] 13 Am. Jur., Corporations, § 319.
[12] 13 Am. Jur., Corporations, §§ 456, 465.
[16–18] 19 Am. Jur., Equity, § 489 *et seq.*
[19–21] 13 Am. Jur., Corporations, §§ 345–348.

4. CORPORATIONS—STOCKHOLDERS' SUIT—FINDING OF COURT—TREAS-
URY STOCK.

> In stockholders' suit for accounting, receiver and distribution
> of corporate assets, finding of trial court that 300 shares of
> stock purchased from participant in organization of the com-
> pany became treasury stock and that total outstanding shares
> thereafter remained at 900 is affirmed.

5. SAME—SALE OF STOCK—AUTHORITY OF PRESIDENT—NOTICE TO
PURCHASER.

> Circumstances surrounding alterations of copy of minutes of di-
> rectors' meeting, while giving president no authority to sell
> stock of foreign corporation owned by defendant domestic
> corporation *held,* to have put purchaser thereof upon express
> notice of want of authority of president to make such sale.

6. APPEAL AND ERROR—STIPULATIONS.

> Whether or not trial court abused its discretion in making or-
> der directing return of stock of defendant corporation which
> had been deposited in escrow pursuant to oral stipulation in
> open court that had not been reduced to writing and signed
> by the parties who may not all have been bound thereby and
> which stipulation has been abandoned or disaffirmed by all
> parties who have appeared, is not determined and the order
> not disturbed.

7. STIPULATIONS—ABANDONMENT.

> Where an oral stipulation is made in open court and thereafter
> abandoned or disaffirmed by all parties who have appeared
> in the case, action taken by the trial court with respect to
> the subject matter thereof under such circumstances is not
> open to question.

8. APPEAL AND ERROR — QUESTIONS REVIEWABLE — STOCKHOLDERS'
DERIVATIVE SUIT.

> Claim that cross-plaintiff stockholders were not entitled to
> derivative relief because no request had been made upon
> corporation's receiver to make an effort to retrieve corpo-
> rate assets from cross-defendants *held,* not available on ap-
> peal, where it appears that such point had not been made in
> court below.

9. CORPORATIONS—RESTITUTION BY WRONGDOING DIRECTORATE.

> A court of equity has the power, in case of fraud, abuse of
> trust, or misappropriation of corporate funds, at the in-
> stance of a single stockholder, to grant relief, and compel
> restitution; and this, too, without any showing that the di-

rectors have been requested, or the corporation has refused, to act, where the holders of the majority of the stock control the directorate, and are themselves the wrongdoers.

10. SAME—PURPOSE OF STOCKHOLDERS' SUIT.
In the usual stockholders' derivative suit, the stockholders are permitted to instigate the action in a court of equity to enforce claim of the corporation.

11. SAME—POSSESSION OF CERTIFICATE OF STOCK—EQUITY.
In an equity suit an equitable right to shares of stock can be protected as well as a legal one, and possession of the certificate of stock is not indispensable.

12. SAME—ACTION BY STOCKHOLDER.
Either an individual or a derivative action or suit may be maintained to established and protect a stockholder's rights in corporate property even without transfer to him on corporate records or books.

13. SAME—STOCKHOLDERS' DERIVATIVE SUIT—FRAUDULENT SALE OF ASSETS.
Where purchasers of practically the entire assets of a domestic corporation knew that sale to them was fraudulent, subsequent buyers of stock from other stockholders without notice of such sale were not precluded from obtaining relief by reason of the fact that person who made each sale was the same person where owner of stock was a different person and did not know of the fraudulent sale of assets.

14. SAME—EQUITABLE STOCKHOLDERS—DERIVATIVE SUIT.
Cross-plaintiffs in seeking to set aside a fraudulent sale of stock of foreign corporation to cross-defendants, which stock was practically all of the assets of domestic corporation *held*, equitable stockholders of domestic corporation entitled to maintain cross bill in derivative suit in order to protect their equitable rights.

15. SAME—CONDITION PRECEDENT TO MAINTENANCE OF DERIVATIVE SUIT.
As a condition precedent to maintenance of derivative suit against cross-defendant to set aside a fraudulent sale of practically the entire assets of domestic corporation, it was not required that cross-plaintiffs pay off to such corporation debts of person who negotiated the sale where such person's debts were properly cancelled by depriving him of all interest in the corporation, and cross-defendant, not a stockholder in such corporation, is not concerned with the payment of such debts.

16. SAME—DERIVATIVE SUIT—LACHES—EXCUSE.

Cross-plaintiff stockholders in their derivative suit to set aside fraudulent sale of practically the entire assets of domestic corporation were not guilty of laches where such purchase had been concealed, cross-plaintiffs had no knowledge of the sale until some years after their purchase, were not guilty of either actual or constructive fraud, were barred from bringing any proceeding for some time because of an injunction of the Federal court and true status was not ascertainable from persons in control of corporation.

17. EQUITY—LACHES—DELAY—EXCUSE.

While long delay without explanation, constitutes laches, the rule is otherwise where the delay is excused.

18. SAME—LACHES—DURATION OF DELAY.

What period of delay will be held sufficient to bar right to relief because of laches depends upon the circumstances of the particular case.

19. CORPORATIONS—DEFECT IN SELLER'S TITLE—NOTICE—BONA FIDE PURCHASER.

A bona fide purchaser of certificates of stock must buy without notice of any defect in seller's title (2 Comp. Laws 1929, §§ 9524, 9526).

20. SAME—SALE OF STOCK—BONA FIDE PURCHASER—FINDING OF COURT.

Finding that purchaser of practically the entire assets of a corporation, consisting of shares of stock of a foreign corporate affiliate was not a bona fide purchaser thereof *held,* proper, where it appears that such purchaser knew of the want of authority on the part of the party negotiating the sale of the stock (2 Comp. Laws 1929, §§ 9524, 9526).

21. SAME—FAILURE TO RECORD STOCK TRANSFER—BONA FIDE PURCHASER—FRAUD.

Fact that purchaser of stock of corporation failed to have same transferred on the books of the corporation for period of eight years gave no notice but permitted that bona fide purchasers for value be deceived as to the status of the stock and operated as a continuation of the fraud originating with the original purchase, hence subsequent purchasers were properly accorded priority over claim of first purchaser (2 Comp. Laws 1929, §§ 9524, 9526).

22. Same—Derivative Suit—Attorney Fees.

   Attorney fees and expenses incident to stockholders' derivative suit to set aside sale of practically the entire assets of a corporation to cross-defendants were properly allowed against the corporation where result of such suit was to restore assets fraudulently sold to cross-defendants, the amount of fees to be determined by trial court.

23. Same—Debt of Officers and Directors — Cancellation of Stock and Debts.

   In stockholders' derivative suit wherein it was found directors and officers of corporation by abstraction of cash and causation of losses to corporation became obligated to it in an amount exceeding value of their stock, their shares are ordered entirely cancelled and treated as no longer existent as part of the capital stock of the corporation and their debts to the corporation, as paid and extinguished.

24. Same — Derivative Suit — Cancellation of Stock of Sales Manager — Fraud.

   In stockholders' derivative suit, stock belonging to general sales manager of corporation who knew of, and participated in, schemes to sell muskrat contracts and other fraudulent enterprises is ordered cancelled and treated as no longer existing as part of the capital stock of the corporation, where it appears stock was given him in part payment for services rendered in furtherance of above-mentioned activities.

25. Same—Derivative Suit—Clean Hands.

   Stockholder, one of several who sought relief in stockholders' derivative suit, *held,* not entitled to such relief where he did not come into court with clean hands in that he had participated in scheme to sell muskrat contracts and other fraudulent enterprises and received the stock in part payment for services as general sales manager.

26. Same—Derivative Suit—Defaulted Parties—Participation in Suit—Discretion of Court.

   Trial court did not abuse its discretion in permitting officers and directors of corporation who were defaulted for want of answer or nonappearance to participate in stockholders' derivative suit to set aside a fraudulent sale of practically the entire assets of the corporation to the extent of seeing that no finding or judgment be rendered against them which was unsupported by at least a prima facie showing.

27. SAME — DERIVATIVE SUIT — CANCELLATION OF JUDGMENT FOR
  MONEY — BONA FIDE PURCHASERS.

> Cross-plaintiffs, seeking relief by way of derivative suit, and
> who are accorded full remedy and rights as bona fide pur-
> chasers for value are not permitted to retain judgments
> against officers and directors for money paid for purchase of
> stock where showing made is not prima facie sufficient to be
> the basis for said personal judgments, such relief is not
> prayed for in their cross bill, affirmance thereof not sought
> on appeal and relief afforded is substantially equal in value
> to a repayment of the purchase moneys with interest.

Appeal from Wayne; Miller (Guy A.) J. Submit-
ted October 10, 1947. (Docket No. 51, Calendar No.
43,653.) Decided June 14, 1948. Rehearing denied
September 9, 1948.

Bill by Dean G. Kimball and another against Mil-
ton S. Bangs and others for appointment for receiv-
er for Mt. Forest Fur Farms of America, Inc., a
Delaware corporation, John R. Westenbarger, in-
tervenor, filed petition for determination of owner-
ship of stock of Mt. Forest Fur Farms of America.
Cross bill by Harley C. Waitman and others, inter-
venors, to determine ownership of stock in Mt. For-
est Fur Farms, a Michigan corporation. Decree
entered fixing rights of all parties. Intervenor Wait-
man and others appeal. Defendants Bangs and oth-
ers appeal. Defendant Westenbarger and others
cross-appeal. Modified and affirmed.

*Fischer, Brown, Sprague, Franklin & Ford* (*David
G. Barnett,* of counsel), for intervenor Waitman and
others.

*Harold R. Smith* (*John P. Neudorfer,* of counsel),
for defendants Detroit Trust Company and Westen-
barger.

*Ray B. Johnston* and *Walter M. Nelson,* for de-
fendant Bangs and others.

Reid, J: The bill of complaint was filed in 1930 by two stockholders in Mt. Forest Fur Farms of America, Inc., a Delaware corporation, on behalf of themselves and other stockholders of that corporation, said corporation being hereinafter referred to as the Delaware corporation. One of the defendants named in the bill is Mt. Forest Fur Farms, a Michigan corporation, and such defendant will hereinafter be referred to as the Michigan corporation. Three individual defendants named in the bill, Milton S. Bangs, his former wife, Lenna B. Bangs (now Corbett), and Donald Campbell, are hereinafter spoken of as Bangs et al.. Bangs et al. were the directors and officers of each of the two corporations. The Delaware corporation was formed by Bangs et al. as a partial rearrangement of the business of the Michigan corporation. The bill alleged that the formation of the Delaware corporation and the transfer to the Delaware corporation of the assets of the Michigan corporation was a fraudulent scheme on the part of the management of the Michigan corporation. The amended bill prayed for an accounting on the part of Bangs et al. and for the appointment of a receiver for each of the two corporations, distribution of the assets of both corporations, and for other relief. On August 21, 1931, Harry J. Merritt was appointed receiver of the Delaware corporation with the consent of that corporation.

Upon the formation of the Delaware corporation, the Michigan corporation transferred its property to the Delaware corporation and in return received certain shares of stock in the Delaware corporation, said to represent about 48 per cent. of the voting stock in the Delaware corporation. This block of stock in the Delaware corporation constituted *practically the entire assets* of the Michigan corporation and is hereinafter referred to as the stock in ques-

tion. Cross-defendant John R. Westenbarger (together with those to whom he has made assignments of interests or part interests, hereinafter referred to as the Westenbarger interests) claims the stock in question by reason of a sale made by M. S. Bangs, allegedly as general manager of the Michigan corporation, on June 6, 1934, to Westenbarger.

Individuals who later on were sold stock or assignments designated as "units of interest" in stock of the Michigan corporation intervened and a group of such intervenors who actively participated in the hearing in the court below, disputing the validity of the sale to Westenbarger, are hereinafter referred to as Waitman *et al.* The issue to be determined is joined between the Westenbarger interests on one side and Waitman *et al.* on the other side.

The lower court properly determined that although the issue would have been more appropriately triable in a separate plenary suit, still the question not having been seasonably raised or suggested until the hearing had progressed to great length at great cost to the parties, the court should proceed to a final determination. The propriety of such ruling is not drawn in question or stated as a question involved. The cross bill of Waitman *et al.* is a derivative suit by stockholders on behalf of the Michigan corporation.

The most important question for our determination in this case is concerning the validity of the sale of the block of stock in question by defendant M. S. Bangs to cross-defendant Westenbarger. Waitman *et al.* claim the sale to have been without the authorization of the Michigan corporation, its directors or stockholders, and claim that such transfer was fraudulent as to the Michigan corporation, its stockholders and creditors, and null and void.

The trial court found Westenbarger not a bona fide purchaser and determined that Waitman *et al.*

as purchasers of units of interest are entitled to priority over the Westenbarger interests, each purchaser of units being entitled for each unit to 1/900 of the 111,558 shares of stock of Vermilion Bay Land Company (which is the name of the Delaware corporation since its reorganization under section 77B of the Federal bankruptcy act), which stock is now held by the present receiver. Hugh Francis, and that the Detroit Trust Company, trustee, assignee of Westenbarger interests, is entitled to the remaining 6507/7200 of the total of the 111,558 shares of the Vermilion Bay Land Company, and that the parties in such proportion should receive the benefits of dividends when declared or distribution of assets when made; further, that the 111,558 shares of Vermilion Bay Land Company (substituted by court order for the stock in question) when issued shall be surrendered for transfer and issuance of voting trust certificates in denominations convenient for making such distribution. The decree further provided that Bangs *et al.*, the owners of stock, were so much indebted to the Michigan corporation that they should not hereafter be accorded the position of stockholders, practically extinguishing their stock although not expressly so reciting. Waitman *et al.* and Bangs *et al.* appealed; Westenbarger interests cross-appealed.

This being a chancery proceeding, we hear the case *de novo*.

In 1925 Mr. and Mrs. Bangs were operating a "sort of partnership" for the production of muskrat furs. Soon afterward defendant Donald Campbell became associated with them. On or about July 13, 1926, Milton S. Bangs and Lenna B. Bangs, his wife, together with Donald Campbell and Jerry E. M. Coulson, formed and promoted the Michigan corporation. The corporation had capital stock of the amount of $12,000 represented as fully paid in, di-

vided into 1,200 shares of the par value of $10 each. Of these shares, 270 were issued to Campbell, 30 shares to Bangs, 600 shares to Mrs. Bangs and 300 shares to Coulson. The principal avowed purpose of the Michigan corporation was the breeding of muskrats in captivity.

There appears in the minutes of the Michigan corporation a recital that Bangs purchased the 300 shares from Coulson and that adjustments should be made in the Bangs account with the corporation, evidently on account of the corporation's having advanced $4,250 for Bangs to pay Coulson for his stock. Notwithstanding such recital on the minutes of the corporation, it is clearly established by the testimony that the stock of Coulson became treasury stock and that the total outstanding shares from that time on were 900 shares. The lower court so found and we affirm that finding.

From its inception the business of the Michigan corporation and later the business of the Delaware corporation was carried on under the control of Bangs, until the appointment of a receiver respectively for each of the corporations.

The only asset of the Michigan corporation at the time of the incorporation was 40 acres of land at Mt. Forest in Bay county, Michigan, which was considered to be worth not more than $500, so that the corporation was grossly overcapitalized in its beginning. Very large sums of money came into the possession of the corporation through the sale of so-called muskrat contracts. The nature of such contracts is set forth in detail in *Morlock* v. *Mount Forest Fur Farms of America, Inc.*, 269 Mich. 549.

The trial court in the case at bar found:

"The $662,000, or thereabouts, which was raised from the sale of rat contracts was received from buyers of those contracts in the time between January 15, 1926 and March 28, 1928. After March 28, 1928,

no more contracts were sold. From these consider-
ations, the obvious conclusion is that the sale of rat
contracts was a fraud upon the public, was so in-
tended from the start, was based upon misrepresen-
tations of facts known to be false, and without the
slightest regard to whether they were true or false,
and was continued long after the slightest shred of
possibility had vanished that there could be any such
thing under the plan of operations as the successful
breeding of these animals in captivity."

Campbell testified:

"We [evidently referring to the Michigan corpo-
ration] took in, as far as I can remember, 1,134,000
from the public.

"Q. From the sale of contracts?

"A. That was everything. That I understand is
the total cash we took in from the public."

The Michigan corporation practically went out of
business in the year 1928. Evidently this was due to
the litigation which was foreseen based upon non-
fulfillment of rat contracts. One of such contracts
was considered by this Court in the *Morlock Case,
supra*. On March 29, 1928, the Delaware corpora-
tion was organized and thereupon all outstanding
rat contracts were assigned to the Delaware corpo-
ration, which assumed and agreed to pay all liabili-
ties thereunder. During the year 1927, the Michi-
gan corporation purchased interests in two tracts of
land in Louisiana, one of which was known as the
10,000-acre tract and the other as the 52,000-acre
tract, the latter being located in Plaquemines parish
in Louisiana and having cost approximately $88,-
000, and being swamp lands below New Orleans west
of the Mississippi river, valuable only for trapping
purposes and for mineral rights. The Michigan cor-
poration conveyed to the Delaware corporation all
of its Louisiana property as well as all of its other
property, which conveyances doubtless had a be-

wildering effect upon the holders of rat contracts and evidently would have operated as an obstacle in their path if they had sought recovery based on nonperformance by the Michigan corporation of its rat contracts. Nevertheless the principal object of Bangs *et al.* seems to have been a stock-selling scheme substituted for the scheme of selling muskrat contracts.

Upon the Delaware corporation being formed, a systematic and organized effort was begun by Bangs and others to induce rat contract holders to trade their contracts for stock in the Delaware corporation, in which matter the trial judge found that Bangs and others so far succeeded that eventually between 80 and 90 per cent. of the rat contracts were so traded in, thus to that extent ridding the Michigan and Delaware corporations of liability on the outstanding rat contracts. Several holders of rat contracts, who did not surrender their contracts, belatedly filed a petition in bankruptcy against the Delaware corporation, which effort failed. See *Mount Forest Fur Farms of America, Inc.,* v. *Farnsworth* (C. C. A.), 92 Fed. (2d) 342. The Delaware corporation continued its operations until the appointment of Mr. Merritt as receiver on August 21, 1931, the corporation in the meantime having obtained only small cash receipts and possibly some. small sums for the sale of ranching privileges, but having received from the sale of its class A stock at $10 a share a total of about $530,000.

On or about June 6, 1934, after carefully planned. solicitation by Westenbarger, M. S. Bangs undertook to sell to Westenbarger the stock in question, the Michigan corporation's holding of Delaware corporation's capital stock. At that time the charter of the Delaware corporation had become void and its corporate powers had ceased, and such was the condition of the corporation during the period,

April 1, 1933 to December 23, 1937. (The charter of the Michigan corporation became void August 31, 1933, and was revived in full force and effect, December 1, 1937.) However, Bangs was continuing to act as general manager of the Michigan corporation.

Westenbarger had been for several years an office associate of Harry J. Merritt, the receiver of the Delaware corporation, who was an attorney and at that time circuit court commissioner for the county of Oakland. Westenbarger, who was a constable, had been process server in Merritt's court and also had acted as process server for several attorneys in Oakland county. Adjacent to the offices occupied by Merritt and Westenbarger was an office occupied by defendant Skinner as an insurance agent. Mr. Noble, who had acted as bookkeeper for the Delaware corporation before Merritt's appointment, was continued in such capacity by the receiver, in the same suite of offices with Westenbarger. For two or three months before purchasing the stock in question, Mr. Westenbarger had been contemplating the purchase and had gone into the office occupied by Mr. Noble and asked him about the shares of stock, and Mr. Noble told him that the stock in question was 100,000 shares of class C stock and 110,703 shares of class B stock.

Westenbarger testified that he was familiar with the Michigan corporation, Mt. Forest Fur Farm, "from the very conception" and that for two or three years before his purchase of the stock he had heard talk around the office about Mt. Forest from people coming in and going out who were interested in Mt. Forest and further, that he had discussed Mt. Forest with Mr. Skinner many times beginning around March, 1934. So far as this record indicates, it is incredible that Mr. Westenbarger, who was the office associate of Mr. Merritt and was on friendly terms

with Mr. Merritt and Mr. Noble, his bookkeeper, during the two or three months when he was contemplating buying the stock in question, should not have fully informed himself how the matters of the Delaware corporation stood. There was no unwillingness apparent on the part of Merritt or Noble to reveal to Westenbarger information concerning the stock in question. There was every incentive on the part of Westenbarger to obtain complete knowledge; he had but to step into the adjacent office and he would be shown any matter that he desired to know. He cannot be treated as a person who was compelled to buy in the dark. On the contrary, he had a great abundance of direct information as to the affairs of both the Delaware and Michigan corporations.

While Mr. Westenbarger was contemplating buying the stock, he interviewed Mr. Skinner upon the subject and asked Mr. Skinner to join with him in buying the stock, and he told Mr. Skinner that there was sulphur on the land in Louisiana, with a large sulphur plant on the property, and that there were some oil wells on the property. Mr. Conway, who negotiated the purchase of the stock in question for Westenbarger, had been requested by Mr. Merritt, the receiver, to investigate the Louisiana property while on a trip to Texas. Mr. Conway testified:

"The sale of the stock that Westenbarger bought was bought after I had gone down to Louisiana and other places and looked at their holdings, and actuated by honesty, told them that they should not sell that property for the sum that was offered, even though it cost me a commission of $4,000."

Merritt, the receiver, in his testimony spoke of total potential liabilities of the Michigan corporation

which were assumed by the Delaware corporation of the kind described in the *Morlock Case, supra,* and gave the figure of $3,000,000 as the total of such liabilities. As we have above described, such liabilities were reduced by holders of rat contracts accepting stock in the Delaware corporation. After such reduction there remained a small fraction of the $3,000,000 of liabilities for which the Michigan corporation was primarily liable, but the remaining rat contracts, the basis for the remaining claims, were fast nearing the bar of the statute of limitations. At the time of the sale, June 6, 1934, there were accumulated royalties and the testimony of Mr. Merritt as to the amount thereof is unsatisfactory and obscure. With no appreciable change of status of the Delaware corporation intervening, about eight months after the sale to Westenbarger Mr. Skinner made an affidavit in the bankruptcy proceedings that the assets were worth $5,000,000, contingent only upon the winning of a suit as to mineral rights. Similar statements appear in an answer to petition for receiver signed by Merritt, Westenbarger and others, verified February 2, 1935.

Westenbarger testified concerning Bangs, with whom Conway was employed to negotiate, "I thought Mr. Bangs would sell only to some one who stood ready to do something that was not right." It is not shown that Conway obtained any impression concerning Bangs from any person other than Westenbarger.

About four days before June 6, 1934, Conway in response to a telephone call from Westenbarger came to the receiver's office in Royal Oak, met Westenbarger and was provided with $1,000 in currency, $600 of which Westenbarger had borrowed. Conway drove to Bangs' place in the country near Brighton and in consequence of the great suspicion which was instilled in Conway's mind concerning

Bangs, evidently by Westenbarger, he (Conway) carried the $1,000 in currency in his shoes. Conway testified that Bangs' place seemed to be a "gangsters' place." He could not secure admission, was told that Bangs was not at home, and left word for Bangs to telephone him. Within a few days Conway returned to the Brighton home, again carrying the $1,000 in bills in his shoes. On this occasion he had a conference with Bangs. Bangs asked who Conway's principal was and Conway refused to say. Bangs informed Conway that the stock in question was the stock of the Michigan corporation and offered to sell to Conway for $1,000 but said that the certificates were in Detroit and the deal would have to be closed there. An appointment was made to meet in the Tuller hotel in Detroit on June 6, 1934. On his return to Westenbarger's office, Conway informed Westenbarger that he, Conway, was unfamiliar with handling a stock transaction of that sort and requested that somebody more familiar with stock transactions should aid him in completing the transaction. Mr. Westenbarger some time before his purchase of the stock had assured himself as to the details concerning the sale, including the number of shares and ownership.

On June 6, 1934, by arrangement of Mr. Westenbarger, Mr. Skinner went to the Tuller hotel to meet with Conway and Bangs. Skinner and Conway separately registered at the hotel and they took separate rooms. Bangs appeared, got in contact with Conway and sought to advance the price to $1,500. Conway had Skinner join them but Skinner's name was not told to Bangs for fear that Bangs would remember seeing it on the office door next to Mr. Merritt's office. Bangs produced Exhibit No. 6, a sheet of paper purporting to be a certified copy of minutes of the Michigan corporation minute book, showing

the minutes of a directors meeting held the previous day, June 5, 1934. Bangs testified that he and Skinner had made up the exhibit in the Tuller hotel, Skinner dictating most of it to the public stenographer, and that Skinner suggested putting in the names of the directors.

It is claimed by the Westenbarger interests that Mr. Bangs had authority to make the sale by reason of a resolution adopted at the meeting of the directors of March 31, 1937, as follows:

"The general manager of Mt. Forest Fur Farms is authorized by the board of directors to transact any and all business on behalf of the board of directors between meetings of the board of directors, said acts to be approved by the next meeting of the board of directors."

However, as a matter of practical construction as to the effect of that resolution, Mr. Bangs apparently considered himself not authorized by that resolution or by any other authorization to make the sale in question. Bangs told Conway that it was necessary to have authority from the corporation. Apparently Skinner, acting for Westenbarger, required, and Bangs appreciated, that it would be necessary that there should be a certificate that the board of directors had authorized Bangs to make the sale.

The certificate produced by Bangs, exhibit No. 6, is as follows:

### DIRECTORS MEETING

A Directors Meeting of the Mt. Forest Fur Farm was held at its office at Pleasant Acres Township of Marion, Livingston County, State of Michigan, on the Fifth Day of June 1934.

A majority of the Board of Directors were present, *M. S. Bangs & A. R. Bangs + Ernest Campbell* The minutes of the previous meeting were read and unanimously approved.

The President and General Manager N. S. Bangs, brought to the attention of the Board that an offer for the stock it owns in the Mt Forest Fur Farms of America Inc., had been made by J. P. Conway and it was the recommendation of Mr. Bangs that said offer be accepted. *unanimously decided and did authorize*

After a considerable discussion the facts brought out were: That this Corporation owing several commitments that should be immediately paid, ~~decided to authorize~~ its general manager, M.S.Bangs to negotiate and complete the ~~sale~~ of this above mentioned stock to Mr. Conway.

In pursuance to an amendment to Section VI Article 4 of this Corporation's By-Laws, which was unanimously passed at a regular meeting of said Board of Directors held March 31, 1927, which is as follows: *Farm*

> "The General Manager of the Mt.Forest Fur ~~Company~~ is
> authorized by the Board of Directors to transact
> any and all business on behalf of the Board of
> Directors between meetings of the Board of Directors.
> Said acts are to be approved by the Board of Directors at the next meeting."

This Board authorizes its General Manager to complete this above mentioned transaction with Mr. Conway according thereto. And it further states that M. S. Bangs was elected General Manager of this Corporation the 7th day of July 1926, and is still its General Manager.

---

This is to certify that the above is a true Record according to the Books of the Corporation.

*M. S. Bangs*
*President & Gen. Mas.*

Subscribed and sworn to before me this the 5th day of June 1934.

*Stella M. Coulson*
*Notary Public.*

*My commission expires June 21, 1937*

The interlineations of the names of the directors, "M. S. Bangs, L. B. Bangs & Donald Campbell," also the words, "absent none," also, "O. K. M. S. B;" and lower down, near the middle of the exhibit the striking out of the words, "decided to authorize," and the writing in of the words, "unanimously decided and did authorize;" the changing of the word "same" to the word "sale" and the changing of the word "company" to the word "farm" further down— all these changes are said to be in the handwriting of M. S. Bangs and all were made with the knowledge of and in the presence of Mr. Skinner, the agent of Westenbarger. Mr. Skinner knew that while Mr. Bangs, one of the directors, was present at the time of the making of exhibit No. 6, the other two directors, Lenna B. Bangs and Donald Compbell, were not present, and Mr. Skinner was also informed that no meeting of the board of directors was held to authorize the sale or the making of the certificate, exhibit No. 6. It is the undisputed testimony that no meeting of the board of directors occurred on June 5, 1934, though such meeting is indicated in the certificate. Skinner testified that at a later period he made an examination of the minute book of the Michigan corporation and his examination disclosed there were no minutes of any such meeting as indicated in exhibit No. 6.

The trial judge speaking of the alteration of exhibit No. 6 said:

"At Mr. Skinner's suggestion, this purported copy was altered. How a copy of a resolution supposed to exist on the minute book of the corporation can be altered is beyond my comprehension."

After the completion of alterations of exhibit No. 6, the $1,000 cash was produced and after some delay Mr. Bangs produced the certificates of stock in question, the $1,000 was paid, there was an exchange of

receipts and other papers surrounding the transaction, and the certificates of stock were indorsed by M. S. Bangs. The certificates showed on their face and by the manner of their indorsement that they had been the property of the Michigan corporation. Mr. Westenbarger of Royal Oak received the certificates of stock in question and was given, as Mr. Skinner testified, a full report of the transactions at the Tuller hotel, and afterwards paid Conway $250 cash for his services.

Bangs used the $1,000 to pay his personal debts. Neither Mrs. Bangs nor Campbell, being a majority of the board of directors, were told anything about the sale of the stock in question to Westenbarger until a year or more afterwards, and then were told that the stock was not sold but the receiver was given voting power only. The board of directors never ratified the transaction. The $1,000 was never placed in the treasury of the Michigan corporation. The purported sale, if valid, would deprive the Michigan corporation of practically all its assets.

All the circumstances surrounding the obtaining, altering and later delivery to Westenbarger of exhibit No. 6, while giving no valid authority to Bangs to make a sale, still charged Westenbarger with express notice of the want of authority of Bangs.

The injunction of the lower court forbade any sale or disposition of the property of the Michigan corporation. The charter of the Michigan corporation became void, August 31, 1933, and was revived in full force and effect, December 1, 1937.

Westenbarger never listed the stock with the receiver as having been purchased by him and never made any attempt whatever to cause any record of his purchase to be made on the books of the Delaware corporation, although he had four years in which to do so, after his purchase and before the institution of bankruptcy proceedings of the Dela-

ware corporation. It cannot be doubted that if he had requested it, the record would have been made either by Mr. Noble, the bookkeeper, or by Mr. Merritt's own personal direction. The failure of Westenbarger to cause such record to be made left the situation open so that Bangs, claiming to own a majority of the stock of the Michigan corporation, but actually selling Mrs. Bangs' stock with her consent, was enabled to sell to such purchasers as Waitman *et al.*, units of interest without such purchasers having any actual notice or knowledge of Westenbarger's claimed purchase and of the Michigan corporation's consequent lack of assets.

The Westenbarger interests state five questions they consider involved, of which question 1 is: Did the court below abuse judicial discretion in directing the return of stock deposited in escrow under a stipulation which had been abandoned during the course of litigation? This question has to do with the matter of an oral stipulation for settlement of this suit dictated September, 1937, by Mr. Lacy (who at that time represented the Michigan corporation and other clients) during the time this suit was pending and before the final hearing; it was stated in open court but not reduced to writing nor signed by the parties and there seems to be some uncertainty as to whether all the parties in interest can be considered as being bound by the stipulation. In any event, the stipulation has been abandoned or disaffirmed by all parties who have appeared in this case. We feel, therefore, we need give that question no further consideration.

The Westenbarger interests state question 2 substantially as follows: Can Waitman *et al.* as stockholders of the Michigan corporation maintain a derivative suit in its behalf to set aside the sale of the stock to Westenbarger?

Mr. Smith, attorney for the Westenbarger interests, claims that the basis for Waitman *et al.* filing their cross bill is that the Michigan corporation could not pursue the remedy of rescission or claim its stock back from Westenbarger because the corporation was under the domination of fraudulent and dishonest management. Mr. Smith claims in substance that at the time Waitman *et al.* filed their cross bill, the Michigan corporation was in receivership and that a demand should have been made upon the receiver to take the necessary proceedings against Westenbarger as a condition precedent to the right of Waitman *et al.* to seek derivative relief and that there is no evidence in this case that such a demand was made upon the receiver. Mr. Ford, for Waitman *et al.*, says that this point that no demand was made on the receiver to file a bill against Westenbarger was not raised in the court below. An examination of the rather lengthy record convinces us that Mr. Ford's statement is correct that the point was not raised in the court below and is not available to the Westenbarger interests at this time.

In *Van Wie* v. *Storm,* 278 Mich. 632, 636, we quoted with approval as follows:

"In *Miner* v. *Belle Isle Ice Co.* (syllabus), 93 Mich. 97 (17 L.R.A. 412), we held:

" 'A court of equity has the power, in case of fraud, abuse of trust, or misappropriation of corporate funds, at the instance of a single stockholder, to grant relief, and compel restitution; and this, too, without any showing that the directors have been requested, or the corporation has refused, to act, where the holders of the majority of the stock control the directorate, and are themselves the wrong-doers.' "

See, also, *Torrey* v. *Toledo Portland Cement Co.,* 150 Mich. 86, 91.

In *Dean* v. *Kellogg*, 294 Mich. 200, 207, we said:

" 'There is no doubt of the power of a court of equity, in case of fraud, abuse of trust, or misappropriation of corporation funds, at the instance of a single stockholder, to grant relief, and compel a restitution.' *Miner* v. *Belle Isle Ice Co.*, 93 Mich. 97, 112 (17 L.R.A. 412). In the usual stockholders' derivative suit, the stockholders as plaintiffs are permitted to instigate the action in a court of equity to enforce a claim of the corporation. *Foss* v. *Harbottle*, 2 Hare's Ch. 461 (67 Eng. Rep. 189); *Hawes* v. *Oakland*, 104 U. S. 450 (26 L. Ed. 827)."

We note the following in 13 Fletcher, Cyclopedia Corporations (Perm. Ed.), chap. 58, § 5976, pp. 349, 350:

"It has been held that a mere equitable right to shares is not enough to give one a standing to sue; but since the suit is in equity, there is no reason why an equitable right cannot be protected, as well as a legal right, and the possession of a certificate is not indispensable."

In footnote 44, appended to the above cited section, we also note the following:

"While there seems to be very little direct authority on the precise proposition, it seems that either an individual or a derivative action or suit may be maintained to establish and protect stockholder's rights in the corporate property, even without transfer to him on corporate records or books. *Graeser* v. *Phoenix Finance Company of Des Moines*, 218 Iowa, 1112 (254 N. W. 859, 863). * * *

"Owners of bank shares who were fraudulently induced, by means of stock manipulation, to exchange their shares for manipulated stock in another bank, *held*, to have sufficient equitable interest in shares exchanged, if allegations of fraud and manipulation be proven, to maintain bill in nature of stockholders' suit for wrong done to their corporation which was despoiled of its assets as result

of transactions in suit. *Willcox* v. *Harriman Securities Corp.,* 10 Fed. Supp. 532."

Mr. Smith for the Westenbarger interests claims that the rights of Waitman *et al.* are subject to the rights of Mr. Bangs, from whom Waitman *et al.* purchased their units of stock in the Michigan corporation. Mr. Smith further claims that Mr. Bangs could not maintain a suit to redress wrongs perpetrated by him on the Michigan corporation as he was the perpetrator of the wrong and that the equitable rights of Waitman *et al.* rise no higher than the rights of their predecessors. However, Waitman *et al.* bought their units of interest in Mrs. Bangs' stock through Mr. Bangs. Mrs. Bangs was not a party to the sale of the stock to Westenbarger but was then divorced from Mr. Bangs and living separate and apart from him. Mrs. Bangs was deceived and defrauded by Mr. Bangs. Mr. Bangs told her that the stock in question was not sold but that it was turned over for voting purposes only. She made no acquiescence in the fraudulent sale to Westenbarger because she had no knowledge of it. Therefore, Waitman *et al.,* being the assignees of Mrs. Bangs' rights, are not in this particular to be held to only such relief as could be afforded to or claimed by Mr. Bangs.

Mr. Ford, attorney for Waitman *et al.,* cites the showing in the record that Mr. Neudorfer, while he was receiver of the Michigan corporation, was one of Mr. Westenbarger's attorneys of record, and further, that Mr. Smith, who is the attorney for the Westenbarger interests in this present appeal and who was attorney for them in the trial in the court below, was appointed by the trial court as attorney for Mr. Francis, the receiver, to have possession of the disputed assets. Such was part of the background against which Westenbarger made no claim in the

court below that the stockholders should go through the useless formality of asking Mr. Francis to prosecute the claim of Waitman *et al.* against the Westenbarger interests.

It would be futile for Waitman *et al.* to make any demand upon Bangs or upon the corporation which he so completely dominated for action to set aside the sale to Westenbarger. Waitman *et al.* have valid grounds for the setting aside of the sale to Westenbarger and there is no other remedy open to Waitman *et al.* except the prosecution of their derivative suit as set forth in their cross bill. The Westenbarger interests claim that Waitman *et al.* being not in fact the holders of certificates of stock are not to be recognized. We consider that Waitman *et al.* are to be treated as equitable stockholders and as such are entitled to maintain their cross bill. This suit being in chancery, there is no reason why their equitable rights cannot be protected.

Westenbarger claims that Waitman *et al.* should pay off the debts of Bangs *et al.* to the Michigan corporation as a condition precedent to the derivative suit. However, those debts were properly cancelled by the lower court by deprivation of Bangs *et al.* of all interest in the corporation.

Moreover, Westenbarger is not to be considered as a stockholder in the Michigan corporation. He swore to a petition in which he alleged he was such a stockholder, in order to get his attorney appointed receiver of the Michigan corporation, but makes no claim to participation in case of award to the Michigan corporation of interest in or ownership of the stock in question. Not being a stockholder, he is not too much concerned with the matters of adjustment between the Michigan corporation and Bangs or payment by Waitman *et al.* of Bangs' debt to the Michigan corporation.

The Westenbarger interests assert that Waitman *et al.* are barred by laches from maintaining their cross bill.[*]   Waitman *et al.* bought their stock for the most part during the years from 1938 to 1942. Waitman *et al.* were entirely ignorant of the fact that Westenbarger had received the assignment in question.   They had no actual knowledge of his assignment until some years after their purchase. They intended no fraud, neither were they guilty of actual or constructive fraud.   They paid cash not only for what the stock could well be thought to be worth but even in excess thereof.   For the greater part of the time after they made their purchases they were barred by the injunction of the Federal court from bringing any proceeding and the affairs of the Michigan corporation in which they bought their units of interest were in the hands of Bangs and his associates, who withheld from Waitman *et al.* the true status of the Michigan corporation and were not interested in aiding Waitman *et al.* in asserting any rights against Westenbarger.

"While long delay, without explanation, constitutes laches, the rule is otherwise where the delay is excused.   What period of delay will be held sufficient to bar the complainant's right to relief depends upon the circumstances of the particular case."   14 C.J. § 1459, p. 939.

"The interveners were not misled by any action, or inaction, of plaintiff.   The lapse of time during which the lien continued did not prejudice them; they had no knowledge as to whether the lien had been in existence 30 days or during the entire period since the stock had been pledged.   Plaintiff remained the owner of the stock until it was delivered to a bona fide purchaser; and, under the circumstances of this case, cannot be said to be guilty of laches giving interveners the right to the stock." *Robinson* v. *Robson*, 297 Mich. 119, 133, 134.

---

[*] Waitman *et al.* filed their cross bill on June 1, 1945.

· The Westenbarger interests further state as the third question involved, can the Michigan corporation set aside the sale of the stock to Westenbarger? Under this heading the Westenbarger interests claim that the Michigan corporation is estopped by the secretary's certificate, exhibit No. 6, which has heretofore been referred to, and which was handed over, with its alterations, to Westenbarger, who at that time knew it to be false.

Section 5 of the uniform stock transfer act* (2 Comp. Laws 1929, § 9524 [Stat. Ann. § 19.335]) is as follows:

"The delivery of a certificate to transfer title in accordance with the provisions of section one, is effectual, except as provided in section seven, though made by one having no right of possession and having no authority from the owner of the certificate or from the person purporting to transfer the title."

Section 7 of the act* (2 Comp. Laws 1929, § 9526 [Stat. Ann. § 19.337]) is as follows:

"If the indorsement or delivery of a certificate,

(a) Was procured by fraud or duress, or

(b) Was made under such mistake as to make the indorsement or delivery inequitable; or, if the delivery of a certificate was made

(c) Without authority from the owner, or

(d) After the owner's death or legal incapacity, the possession of the certificate may be reclaimed and the transfer thereof rescinded, unless:

(1) The certificate has been transferred to a purchaser for value in good faith without notice of any facts making the transfer wrongful; or,

(2) The injured person has elected to waive the injury, or has been guilty of laches in endeavoring to enforce his rights.

Any court of appropriate jurisdiction may enforce specifically such right to reclaim the possession of

---

* Act No. 106, Pub. Acts 1913.—Reporter.

the certificate or to rescind the transfer thereof and, pending litigation, may enjoin the further transfer of the certificate or impound it."

A bona fide purchaser of certificates of stock must buy without notice of any defect in seller's title. See syllabus (2), *National Turners Building & Loan Ass'n* v. *Schreitmueller,* 288 Mich. 580.

In the instant case Bangs was without any real authority to make the sale to Westenbarger. Messrs. Conway and Skinner, both being agents of Westenbarger, knew of the want of authority of Bangs. It cannot be said that Westenbarger was without knowledge of the want of authority of Bangs. The trial court properly found that Westenbarger was not a bona fide purchaser without notice. That finding we affirm.

Question number 4 is, should the court below have decided that Westenbarger was estopped to deny the priority of the claims of Waitman *et al.?*

For the reasons hereinbefore recited, the failure of Westenbarger to cause a transfer of the stock in question from the name of the Michigan corporation to his name on the books of the Delaware corporation during an eight-hour period gave no notice but permitted that bona fide purchasers for value be deceived as to the status of the stock in question and operated as a continuation of Westenbarger's fraud that originated with his purchase in the first instance. Under these circumstances the court below properly decided that the claims of Waitman *et al.* had priority over the claim of Westenbarger.

The fifth question raised by the Westenbarger interests is, should the court have permitted Waitman *et al.* to file claim for reimbursement for the fees of their attorneys?

In view of the complexity of the case and the difficulties under which Waitman *et al.* have labored,

we think that the trial court should allow attorney fees and expenses in favor of Waitman *et al.* against the Michigan corporation. The attorney for Waitman *et al.* should have such fees as the court who tried the case shall determine that he was entitled to. As far as concerns the attorney fee earned by attorneys for Waitman *et al.*, that part of the case is remanded to the trial court for its determination.

The trial court properly found that M. S. Bangs, Lenna B. Bangs (now Corbett) and Donald Campbell in their management of the affairs of the Michigan corporation and by their fraudulent acts, made abstractions of cash and caused losses to the company far exceeding the value of the stock held by all three. Therefore, their stock is to be treated as entirely cancelled and as no longer existent as part of the capital stock of the corporation. As a result of such cancellation of their stock, all debts of M. S. Bangs, Lenna B. Bangs (Corbett) and Donald Campbell to the corporation are to be considered as paid and they are extinguished.

One of the members of the group represented by Mr. Ford, attorney for Waitman *et al.,* is C. M. McGuffie. McGuffie not only was sales manager for Bangs during the period of selling rat contracts but also had a prominent part in the sale of stock in the Delaware corporation. He visited the various properties held by the Bangs-dominated corporations, and had abundant opportunity to observe the extent of production of muskrats and to know the falsity of representations of Bangs and the impossibility of fulfillment of the rat contracts. He must be held accountable for all the fraud in the sale of rat contracts that is attributable to Bangs because he actively participated as a party in it. He was paid between $50,000 and $60,000 for 2 1/2 years' work and in addition thereto, received 10 shares of stock of the Michigan corporation which are still outstanding in

his name. This stock was part of payments to him for his participation in fraudulent enterprises, as general sales manager. He shall not be allowed to profit by reason of his illegal acts. It cannot be said that the trial court did him any injustice in withholding from him any right to participate further in the property and affairs of the Michigan corporation. His stock is also cancelled and treated as no longer existing as part of the capital stock of the Michigan corporation. McGuffie is a party seeking relief in equity but he does not come into the equity court with clean hands. The relief he seeks is denied him.

The following is a list of the shares of stock (and owners of same) which are to be treated as the total outstanding stock of the Michigan corporation:

| Name of Owner | Number of Shares |
|---|---|
| Harley C. Waitman | 22 |
| J. F. Wuerth | 5½ |
| Marian Wuerth | 2½ |
| J. F. Boyd | 24 |
| L. V. Reynolds and **Fannie Reynolds** | 6¼ |
| A. J. Wissman | ½ |
| E. C. Harriss | ¼ |
| K. Sherwood | 1 |
| C. W. McCoy | 5 |
| Robert Symons | 1¾ |
| L. L. Thompson | ½ |
| A. P. Karsteff | ¼ |
| Ernest D. and Maggie McClintic | ½ |
| Harry T. and Doris England | 1½ |
| W. R. Hires | 1½ |
| James G. Neptune | ½ |
| Paul E. Bonfiglio | 3⅛ |
| Erma R. Bonfiglio | 2 |
| E. S. Blank | 1½ |
| Fred Taylor | 1 |

| Name of Owner | Number of Shares |
|---|---|
| Willis Goodwin | $\frac{1}{4}$ |
| Leonard Sidle | $1\frac{1}{2}$ |
| Earl Rohn, Trustee | $3\frac{1}{2}$ |
| D. Elgar Evans | $\frac{1}{4}$ |
| Harry E. Gates | 1 |
| Fred L. Shields | $\frac{1}{2}$ |
| Henry S. Kelley | $\frac{1}{16}$ |
| Kenneth I. Heck | $1\frac{1}{2}$ |
| | $89\frac{11}{16}$ |

Defendants M. S. Bangs and Lenna B. Bangs (Corbett) appeared in the court below but were defaulted for want of an answer to the cross bill of Waitman *et al.* Defendant Donald Campbell was defaulted for nonappearance. Very belatedly the attorney for these parties desired to have their defaults set aside. The court ruled that because of the lateness of their application to set aside their defaults, with the intervening costs and expenses that the parties to this trial had incurred that it would not be just to set aside the default of the three named defendants, but accorded to the three parties the right to participate in the proceedings to the extent of seeing that no finding or judgment was rendered against them which was unsupported by at least a prima facie showing. The court acted fairly and did not abuse its discretion.

The trial court entered judgment in its decree against M. S. Bangs and Lenna B. Bangs (Corbett) evidently for amounts of money paid by Waitman *et al.* for the purchase of their stock. We accord to Waitman *et al.* the position of bona fide purchasers for value and by this means Waitman *et al.* receive all the benefits which accrued from their purchase of units. There is in our view no consistency in the rendition of the judgments against M. S. Bangs and

Lenna B. Bangs (Corbett) and at the same time giving full accord to the rights of Waitman *et al.* claimed by them on behalf of the corporation and indirectly as purchasers of units and equitable stockholders. In the decree to be entered in this Court, said judgments are to be wiped out and extinguished because the showing is not prima facie sufficient to be the basis for said personal judgments. Waitman *et al.* did not in their cross bill pray for such monetary judgments and do not request that we affirm such judgments and have elected to pursue their remedy as though owners of the stock, and having been decreed their full remedy, shall not at the same time be permitted to maintain a judgment for the amount of the purchase price.

After many and expensive lawsuits and proceedings in State and Federal courts and mismanagement, the assets of the Michigan corporation were found to be of value greater than $100,000; therefore, Waitman *et al.* receive under this decree rights substantially equal in value to a repayment of the moneys, plus interest, that they spent in the purchase of their interests in the stock.

Except as herein otherwise indicated, the decree appealed from is affirmed. A decree shall be entered in this Court in accordance with this opinion, with costs to Waitman *et al.* against the Westenbarger interests.

BUSHNELL, C. J., and SHARPE, BOYLES, DETHMERS, BUTZEL, and CARR, JJ., concurred.

NORTH, J., concurred in the result.