*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MAJID DAMGHANI,

Plaintiff-Appellant,

v

CITY OF KENTWOOD and KENT COUNTY TREASURER,

Defendants-Appellees.

UNPUBLISHED
April 16, 2019

No. 341213
Kent Circuit Court
LC No. 15-011405-CH

Before: RIORDAN, P.J., and MARKEY and LETICA, JJ.

PER CURIAM.

Plaintiff filed the present case seeking a refund of a payment made on a special assessment as well as a declaratory judgment that a foreclosure extinguished the special assessment on his property. Following a bench trial, the trial court entered judgment in favor of defendants. Plaintiff now appeals as of right. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

In August 2014, plaintiff purchased 34.57 acres of property, known as Neighborhood B-4, from the Kent County Treasurer at a public land auction. The Kent County Treasurer acquired the property through foreclosure proceedings in March 2014. Before the foreclosure, while the property was owned by 44th/Shaffer Avenue LLC (Shaffer), the City of Kentwood (the City) levied a special assessment against a larger group of parcels in connection with public improvements for a multiphase development project known as the Ravines. Neighborhood B-4 was one of several planned "neighborhoods" that would make up the Ravines.

Under the General Property Tax Act (GPTA), MCL 211.1 *et seq.*, "all liens against the property, including any lien for unpaid taxes or special assessments, *except future installments of special assessments* and liens recorded by this state or the foreclosing governmental unit pursuant to the natural resources and environmental protection act . . . are extinguished" by a

foreclosure. MCL 211.78k(5)(c) (emphasis added). In other words, "future installments of special assessments" are not extinguished by a foreclosure. Accordingly, the general dispute between the parties involves whether the City actually levied a special assessment and whether the amounts owed were future installments that survived foreclosure. Following a bench trial, the trial court decided the matter in the City's favor, concluding that there was a special assessment and that a balloon payment on that special assessment was a future installment that was not extinguished by the foreclosure.

## A. CREATION OF THE SPECIAL ASSESSMENT

In 2004, Shaffer and the City entered into a "Voluntary Special Assessment/Development Agreement" (VSADA) by which the parties agreed that Shaffer would undertake public improvements required for the development of the Ravines at the City's expense. However, the City's payment was based on "anticipation of special assessments" to be levied against the property, and the City had "no obligation for any payment of funds until after the conclusion of the special assessment proceedings . . . ." On September 7, 2004, the City Commission passed Resolution No. 96-04 to confirm a special assessment roll for the Ravines special assessment district. The confirmed special assessment roll attached to the resolution stated, in pertinent part:

> Term: 10 years from confirmation of roll, i.e., September 7, 2014. Any unpaid balance and interest is due in full upon termination date.
>
> Deferred Installments:
>
> * * *
>
> B.     A payment shall be due annually on the anniversary date of the confirmation of the roll (e.g., without limitation, September 7, 2005, September 7, 2006, September 7, 2006, September 7, 2007, etc.) in an amount equivalent to the simple interest on any unpaid principal amount.
>
> C.     Principal payments, along with any unpaid simple interest on that portion of the principal, shall be due upon certain governmental approvals being issued consistent with the terms of [the VSADA].

Relevant to section (C) above, the VSADA provided that "[p]rincipal payments, with interest thereon accrued on a pro rata basis, shall be due within 180 days of final zoning approval for a phase or upon the City's issuance of a soil erosion permit for the phase, whichever is earlier."

## B. TRIAL COURT PROCEEDINGS

During the course of this litigation, plaintiff filed a motion to compel cooperation with discovery, asserting that the City had failed to provide full and complete answers to interrogatories and to comply with requests for production of documents. The trial court heard the motion on November 4, 2016. Plaintiff's counsel explained that there were several triggering events that would cause the principal of the special assessment to become due. Thus, he was seeking, among other things, documents regarding development of the Ravines that might reflect the occurrence of a triggering event. The City's attorney explained that the City had already

produced numerous documents and, given the recent narrowing of the issues as a result of a partial grant of summary disposition, it would be more prudent to depose City officials with knowledge concerning the payments and balance of the assessment before and after the foreclosure sale. After a lengthy discussion of the categories of information plaintiff sought, the following exchange occurred:

> [City's Attorney]: Well, your Honor, we've already produced a document that answers every question that [plaintiff's attorney] just raised, and they've had these documents since July. And I'll approach the Court. This is a payment history that is a printout from the City documents (handing), and it includes the entire payment history. *It includes all the trigger dates that* [plaintiff's counsel] *is referring to. The trigger dates for zoning approvals and permits is listed down the left side of the page in the downward column.* The payment history is listed across the top. I produced numerous payment history sheets . . . . [I]f there's questions about these documents, it's not going to be answered by other documents. It's going to be answered by the treasurer or the finance director answering questions about these documents. But all of the things he says that he wants to know are right on these payment histories (indicating).

> The Court: Hmm.

> Do you have this, [plaintiff's attorney]? Other than for the fact that the print is kind of fine. . . . But it does appear to be a fairly comprehensive situation. And even with the fine print, I think I would rather work with that than a banker's box full of stuff.

> [Plaintiff's Attorney]: (Pause) I guess, my colleague has indicated that we have seen at least a document like this. I guess critical to this would be are they just saying this is a document, or are they saying—are they stipulating that these are the trigger dates?

> The Court: Well, I think they're saying both. I think they're saying that is a document which shows the trigger dates, among other things, and the payments. The nice thing about it is it looks like it's all on one page. As long as you've got a magnifying glass, you can probably read it.

> [Plaintiff's Attorney]: . . . [I]f they'll stipulate that those indeed are the trigger dates under the—under the special assessment for—for when things are due, that's fine.

> The Court: I think that's what they're saying. Am I—am I right?

> [City's Attorney]: Well, I am saying that, your Honor. [Emphasis added.]

At a subsequent hearing regarding entry of an order reflecting the outcome of the November 4, 2016 proceeding, plaintiff's attorney indicated that he wanted the parties' stipulation included in the order because he believed that "the City no longer want[ed] to recognize the stipulation . . . ." Defense counsel expressed confusion about the nature of the

-3-

stipulation and indicated that there were a series of documents relevant to the issues which had been explained in detail by Thomas Chase, the City's finance director, during a deposition that took place after the November 4, 2016 hearing. According to defense counsel, Chase "testified and explained the trigger dates, and you can't simply discern the trigger dates from looking at the document itself." In light of the Chase's testimony about the documents, counsel questioned why the stipulation remained necessary. However, he agreed that he would "stipulate to the authenticity of those documents and that the information on them is accurate, as they were explained by Mr. Chase in his deposition." Responding to the City's position, plaintiff's attorney argued that he proceeded in reliance upon the parties' stipulation and expected that the City should be bound by it. After reviewing a transcript of the November 4, 2016 hearing, the trial court entered plaintiff's proposed order, which provided, in pertinent part, the following:

> This matter having come to be heard upon Plaintiff's Motion to Compel Cooperation with Request for Production of Documents, arguments having been heard, and Defendant City of Kentwood having stipulated to the "Due Date Triggers" as set forth in Exhibit 1, the Court being otherwise advised in the premises;
>
> IT IS HEREBY ORDERED that the document attached as Exhibit 1 reflects the payments and trigger dates for the special assessment district on the Subject Property[.]

In relevant part, Exhibit 1 to the order related to "Neighborhood B-4, Phase 1" and stated:

| Due Date Triggers | |
| --- | --- |
| Final Zoning Approval for Phase | 5/1/2006 |
| 180 days from Final Zoning Approval for Phase | 10/28/2006 |
| -OR- | |
| Erosion Permit for a Phase issued | 9/7/2014 |
| Computed Final Date for Phase payment | 10/28/2006 |

At the bottom of the page, the following disclaimer was printed: "NOTE: All dates are for demonstration only. When actual dates are inserted, the interest is automatically recalculated."

The case proceeded to a bench trial. Following opening statements, the trial began with a discussion of the stipulation and whether additional evidence regarding the trigger dates would be allowed. Plaintiff maintained that the stipulation was binding with regard to the trigger dates and that he had tailored discovery to the stipulation. Accordingly, plaintiff asserted that the City could not renege on or impeach the stipulation. Defense counsel asserted that he had been

"unartful in terms of the breadth of the stipulation," but denied that plaintiff would be surprised by other evidence of trigger dates because the information had been elicited during Chase's deposition testimony.[1]

The trial court ruled that additional evidence regarding trigger dates would be allowed. In reaching this conclusion, the trial court stated that it misunderstood the facts when entering the stipulation, having failed to realize that the project was a multiphase development with more than one triggering event and that "some of the phases, in fact . . . most of them, have never been developed." The court apologized for the confusion and offered to adjourn the trial if the parties were caught by surprise at any point and needed further time to prepare. The trial court agreed that the stipulated document would "clearly constitute[] evidence of triggering dates," but it declined to limit the evidence of trigger dates to that document, concluding that it would be more appropriate to "follow the evidence."

At the conclusion of the trial, the trial court provided a lengthy ruling on the record, beginning with a detailed description of the various agreements and resolutions, the foreclosure, plaintiff's purchase of the property, and the pretrial procedure of the case. The trial court defined the question remaining at trial as "whether the VSADA is due and owing on the balloon payment date of September 7, 2014, which would be after the foreclosure, or whether one of the triggering events had extinguished that assessment . . . ." The trial court concluded that neither of the triggering events had occurred before the foreclosure. Accordingly, the balloon payment on the principal came due September 7, 2014—after the March 2014 foreclosure—and constituted a future installment of a special assessment that was not extinguished by the foreclosure.

With respect to the parties' stipulation, the trial court noted that the disclaimer at the bottom of the stipulated document rendered the dates in the document "essentially meaningless." Concluding that it was clear beyond any doubt that the stipulation was factually incorrect, the trial court refused to hold the parties to the stipulation. The trial court subsequently entered an order stating that the special assessment balloon payment was not extinguished and remained a valid lien on plaintiff's property. This appeal followed.

## II. THE STIPULATION

On appeal, plaintiff first argues that the trial court erred when it refused to apply the parties' factual stipulation regarding the occurrence of events that triggered the date on which payment of the special assessment principal became due. We agree, in part.

Stipulations are generally construed under the same rules applicable to interpretation of a contract, *Phillips v Jordan*, 241 Mich App 17, 21; 614 NW2d 183 (2000), and questions involving contract interpretation and the legal effect of a contractual provision are reviewed de novo, *DeFrain v State Farm Mut Auto Ins Co*, 491 Mich 359, 366-367; 817 NW2d 504 (2012).

---

[1] Chase testified that the stipulated document had been prepared by a law firm and that he did not believe the final zoning approval date (from which the final payment date had been computed) was accurate because the property had never actually been developed.

The meaning of a court order is also a question of law reviewed de novo. *Silberstein v Pro-Golf of America, Inc*, 278 Mich App 446, 460; 750 NW2d 615 (2008). Whether the trial court "disregarded a clear and unambiguous factual stipulation by the parties is a legal question, which this Court reviews de novo." *Toll Northville Ltd Partnership v Northville Twp (On Remand)*, 298 Mich App 41, 47; 825 NW2d 646 (2012) (citation omitted).

"A stipulation is an agreement, admission, or concession made by the parties in a legal action with regard to a matter related to the case." *In re Estate of Koch*, 322 Mich App 383, 402; 912 NW2d 205 (2017) (quotation marks and citation omitted). "While a stipulation need not follow any particular form, its terms must be definite and certain in order to afford a proper basis for judicial decision . . . ." *Whitley v Chrysler Corp*, 373 Mich 469, 474; 130 NW2d 26 (1964) (quotation marks and citation omitted). When "[t]he stipulation on its own terms is not clear," the stipulation may be interpreted "in light of the facts and issues as agreed to by the parties and as found by the trial court." *Novi v Detroit*, 433 Mich 414, 436-437; 446 NW2d 118 (1989). Parties may stipulate to the facts of a case, and when a stipulation of facts has been approved by the trial court, those facts are to be taken as conclusive. *Signature Villas, LLC v Ann Arbor*, 269 Mich App 694, 706; 714 NW2d 392 (2006); *Nuriel v Young Women's Christian Ass'n of Metropolitan Detroit*, 186 Mich App 141, 147; 463 NW2d 206 (1990). More fully, the Michigan Supreme Court long ago provided the following warning and guidance concerning the effect of factual stipulations:

> To the bench, the bar, and administrative agencies, be it known herefrom that the practice of submission of questions to any adjudicating forum, judicial or quasi-judicial on stipulation of fact, is praiseworthy in proper cases. It eliminates costly and time consuming hearings. It narrows and delineates issues. *But once stipulations have been received and approved they are sacrosanct. Neither a hearing officer nor a judge may thereafter alter them.* This holding requires no supporting citation. The necessity of the rule is apparent. A party must be able to rest secure on the premise that the stipulated facts and stipulated ultimate conclusionary facts as accepted will be those upon which adjudication is based. Any deviation therefrom results in a denial of due process for the obvious reason that both parties by accepting the stipulation have been foreclosed from making any testimonial or other evidentiary record.

> This is not to say, of course, that the hearing officer or judge may not reject any offered stipulation as incomplete or legally erroneous. The concerned adjudicator has not only that right—he has that duty. But as previously indicated, the time so to do is before final acceptance of the stipulation, not after. [*Dana Corp v Appeal Bd of Mich Employment Security Comm*, 371 Mich 107, 110-111; 123 NW2d 277 (1963) (emphasis added).]

Undoubtedly, there are circumstances in which a trial court is not bound by the parties' stipulation. For instance, the trial court may disregard a stipulation that has been abandoned or disaffirmed by all of the parties, *Kimball v Bangs*, 321 Mich 394, 414; 32 NW2d 831 (1948), or a stipulation of fact that involves considerations beyond the rights of the parties involved, *Bowman v Coleman*, 356 Mich 390, 392-393; 97 NW2d 118 (1959). In *Nuriel*, 186 Mich App at 147, we

also stated that a stipulation "may be set aside where it has been entered into as a result of inadvertence, improvidence or excusable neglect."

In light of the disclaimer on the stipulated document, which clearly stated that the dates contained therein were for "demonstration only," and counsel's concession at trial that he had been "unartful in terms of the breadth of the stipulation," it is arguable that the City agreed to the stipulation as a result of inadvertence, improvidence, or excusable neglect. However, we find this case comparable to *Nuriel* and conclude that this exception does not support the trial court's decision to disregard the stipulation. In *Nuriel*, the plaintiff claimed religious discrimination after she received an anonymous letter containing anti-Semitic statements which she believed was written by one of six individuals involved in the decision to terminate her employment. *Id.* at 144. The plaintiff stipulated that the letter would be analyzed by an expert and compared with handwriting samples from each of the suspected authors. *Id.* She further agreed that "if the expert does not give a conclusive or definitive opinion that a person actually wrote the letter, then that person shall be considered as having not written the letter." *Id.* at 145. The expert was unable to conclusively determine whether any of the individuals wrote the letter, but discovered fingerprints on the letter that could, presumably, be used to identify the author. *Id.* This Court affirmed the trial court's refusal to compel fingerprint samples from the suspected authors, reasoning that the parties' stipulation regarding the effect of the expert's opinion precluded further discovery attempting to establish the individuals already tested as the author. *Id.* at 146-147. This Court further explained that the stipulation could not be set aside on the basis of inadvertence, improvidence, or excusable neglect because the plaintiff had the letter in her possession for three years before it was submitted to the handwriting expert and could have discovered the existence of the fingerprints had she exercised reasonable diligence during that time. *Id.* at 148.

Here, the parties entered into a clear and unambiguous stipulation providing that the document attached to the court's order reflected the trigger dates for the special assessment. The document at issue was contained within the City's records and had, in fact, been disclosed to plaintiff through discovery months before the stipulation was reached. Thus, like the plaintiff in *Nuriel*, the City and its attorney had ample time during which they could have reviewed the document and discovered that it did not contain actual trigger dates. Nonetheless, the City's attorney represented to plaintiff and the trial court that the document contained "all the trigger dates" that plaintiff sought. Plaintiff's counsel even asked for clarification as to whether the City was stipulating that "those indeed are the trigger dates," and defense counsel answered, "I am saying that[.]" The City, having agreed through its attorney to an unambiguous stipulation of fact that was received and approved by the trial court, was bound by the stipulation. *Dana Corp*, 371 Mich at 110-111. The trial court was, likewise, obligated to treat the stipulated fact as sacrosanct, as plaintiff was entitled to "rest secure on the premise that the stipulated facts . . . as accepted will be those upon which adjudication is based." *Id.* at 110. While we recognize that the stipulation was ultimately proven untrue by other evidence, "[c]ourts have long held parties to agreements they make, regardless of the harshness of the results." *Nexteer Auto Corp v Mando America Corp*, 314 Mich App 391, 396; 886 NW2d 906 (2016).

The trial court erred by finding that the triggering events never occurred for the B-4 Neighborhood because it was bound to apply the parties' stipulation concerning the triggering event dates. The stipulated document stated that final zoning approval for Phase 1 of the B-4

Neighborhood was granted on May 1, 2006, resulting in a final payment due date of October 28, 2006, for Phase 1. As such, the portion of the assessment attributable to Phase 1 became due before the March 2014 foreclosure. Because MCL 211.78k(5)(c) only excludes *future* installments of special assessments from the liens that are extinguished by a foreclosure, the portion of the assessment attributable to Phase 1 was extinguished by operation of law.

That being said, when the parties enter into a stipulation, it does not follow that the record is limited to that stipulation. *Signature Villas, LLC*, 269 Mich App at 706. "Where the parties' stipulation is not contradicted, it is within the discretion of the [court] to permit or consider additional proofs supplementing the same." *Id*. As the trial court belatedly realized, the Ravines development was planned as a multiphase project. Under the VSADA, the principal of the special assessment was to be "allocated among the various approved phases for Neighborhoods B-1 through B-4 of the Ravines[.]" While unpaid principal and interest became automatically due 10 years after the special assessment roll was confirmed on September 7, 2004, principal payments could also be triggered earlier based upon "final zoning approval *for a phase* or upon the City's issuance of a soil erosion permit *for the phase* . . . ." (Emphasis added.) According to the planned unit development agreement and the VSADA, Neighborhood B-4 was planned in two phases. The heading on the stipulated document refers to Phase 1 only.[2] Consequently, we find no error in the trial court's decision to take further evidence concerning the occurrence of triggering events and apply that evidence to any amount of the special assessment attributable to Phase 2. Because the amounts attributable to each phase are not readily apparent from the record, we remand for further proceedings.

## III. NATURE OF THE OBLIGATION

Next, plaintiff argues that the trial court erred by concluding that the obligation at issue arose from a special assessment. According to plaintiff, the obligation arose from the VSADA— a contractual agreement between the City and Shaffer—and should have been treated as a contract that was extinguished by the foreclosure. We disagree.

Questions involving statutory interpretation, contract interpretation, or the interpretation of a resolution are reviewed de novo. *46th Circuit Trial Court v Crawford Co*, 476 Mich 131, 140; 719 NW2d 553 (2006). The term "special assessment" refers to "pecuniary exactions made by the government for a special purpose or local improvement, apportioned according to the benefits received." *Wikman v Novi*, 413 Mich 617, 632-633; 322 NW2d 103 (1982). Special assessments for public improvements are a "form of taxation," and a special assessment may be

---

[2] A similar document containing demonstrative figures for Phase 2 was admitted at trial as Exhibit 9. On appeal, plaintiff treats Exhibit 9 as though it was part of the pretrial stipulation concerning trigger dates—a position that is unsupported by our review of the record. Although the City's attorney stipulated to the admissibility of Exhibit 9 at trial, he explicitly stated that he did not agree that Exhibit 9 contained accurate trigger dates, and the document was not attached to the order memorializing the parties' stipulation as to the Phase 1 document.

levied as allowed by municipal charter and applicable ordinances.[3]  See *id*. at 636-637.  See also MCL 117.4d(1)(a).  "They may be collected at the same time and in the same manner as other property taxes.  If unpaid, they may become a lien on the property like other property taxes, or may be collected by an action against the owner of the property."  *Wikman*, 413 Mich at 635 (citations omitted).  "Special assessments are presumed valid."  *Kane v Williamstown Twp*, 301 Mich App 582, 586; 836 NW2d 868 (2013).

Plaintiff argues that the underlying financial obligation relating to Neighborhood B-4 is contractual in nature as opposed to a special assessment.  However, the only authority offered by plaintiff to distinguish between a contract and a special assessment is a citation to an opinion of the Michigan Office of the Attorney General, which in relevant part states:

> "Liens" and notices of liens are recorded in the office of the register of deeds for the county in which the lands are located.  "Special assessments" are not recorded.  Liens may only be accepted for recording where there is a statute permitting such recordation.  *Nelson v Scofield*, 219 Mich 595, 597; 189 NW 185 (1922).  Research discloses no statute authorizing the recording of liens for special assessments levied by local governmental units.  Therefore, the legislative intent evinced by the statutory language is that two categories of liens are not extinguished by foreclosure: 1) future installments of special assessments, and 2) liens recorded by the state or foreclosing governmental unit pursuant to the natural resources and environmental protection act.  [OAG, 2001-2002, No. 7110, p 95, at 97 (June 17, 2002).]

Relying on this discussion of liens and special assessments, plaintiff asserts that the VSADA is not a special assessment because the VSADA was recorded.  However, plaintiff's conclusory argument wholly ignores the fact that the City Commission passed Resolution No. 96-04 to confirm the special assessment roll for the Ravines special assessment district.  Resolution No. 96-04 sought to recover costs for public improvements that conferred a peculiar benefit on the properties in the Ravines special assessment district, and these costs were allocated among each of the "approved phases for Neighborhoods B-1 through B-4 of the Ravines . . . ."  In other words, a special assessment district was created, not by the VSADA, but by Resolution No. 96-04.[4]  And while plaintiff suggests that the recording status of a document is definitive, it does not appear that Resolution No. 96-04 was recorded.  Therefore, to the extent that the opinion of the attorney general has any persuasive value, see *Mich Ed Ass'n Political Action Comm v Secretary of State*, 241 Mich App 432, 441-442; 616 NW2d 234 (2000), it does not support plaintiff's argument that a special assessment was not levied in this case.

---

[3] The City's charter and ordinances provide for the levying of special assessments.  See Kentwood Charter, ch X; Kentwood Code, ch 50.

[4] Indeed, the VSADA did not purport to establish a special assessment, rather it stated that the special assessment would be determined by the City Commission in its discretion.

Apart from reliance on the opinion of the attorney general, plaintiff fails to cite any other legal authority in support of his claim that a contractual obligation, as opposed to a special assessment, is at issue in this case. Plaintiff claims that the rules for creating a special assessment were not followed and that a special assessment does not exist, but he does not cite the applicable rules for levying a special assessment or explain how the procedures in this case deviated from those rules. Likewise, plaintiff argues that a special assessment cannot exist because the City also entered into a contractual relationship with Shaffer under the VSADA, but, again, plaintiff offers no authority for the proposition that the City could not establish a special assessment and also enter into a contract. By failing to adequately brief the merits of the issue and by failing to identify relevant legal authority, plaintiff has abandoned this argument on appeal. See *Goldstone v Bloomfield Twp Pub Library*, 268 Mich App 642, 658; 708 NW2d 740 (2005), aff'd 479 Mich 554 (2007) ("[T]his Court will not search for authority to support a party's position, and the failure to cite authority in support of an issue results in its being deemed abandoned on appeal.") (quotation marks and citation omitted; alteration in original).

## IV. TRIGGER DATES

Next, plaintiff argues that the trial court clearly erred by concluding that the principal on the special assessment came due in September 2014, after the foreclosure. Given our analysis and conclusion of plaintiff's claim of error regarding the effect of the parties' stipulation, we limit our analysis of this issue to Phase 2 only. According to plaintiff, even setting aside the parties' stipulation, the evidence showed that triggering events occurred before the foreclosure, resulting in extinguishment of the special assessment in its entirety under MCL 211.78k(5)(c). We disagree.

A trial court's factual findings in a bench trial are reviewed for clear error. *Chelsea Investment Group LLC v City of Chelsea*, 288 Mich App 239, 250; 792 NW2d 781 (2010). "A finding is clearly erroneous if there is no evidentiary support for it or if this Court is left with a definite and firm conviction that a mistake has been made." *Id*. at 251. "The trial court's findings are given great deference because it is in a better position to examine the facts." *Id*. In contrast, questions involving statutory interpretation, contract interpretation, or the interpretation of a resolution are all reviewed de novo. *46th Circuit Trial Court*, 476 Mich at 140.

"A resolution is the form in which a legislative body expresses a determination or directs a particular action." *Duggan v Clare Co Bd of Comm'rs*, 203 Mich App 573, 576; 513 NW2d 192 (1994). A resolution is treated like a statute, see *Gale v Bd of Supervisors of Oakland Co*, 260 Mich 399, 404; 245 NW 363 (1932), and as such it is interpreted like a statute, see *Bonner v City of Brighton*, 495 Mich 209, 221; 848 NW2d 380 (2014). Accordingly, when interpreting a resolution, "it is a basic requirement that the intent shall be ascertained and given effect." *Dearborn Fire Fighters Ass'n v City of Dearborn*, 323 Mich 414, 421; 35 NW2d 366 (1949). To ascertain intent, "words must be given their plain and ordinary meanings." *Bonner*, 495 Mich at 222. "If the language of the resolution is certain and unambiguous, courts must apply the resolution as written." *Hardaway v Wayne Co*, 494 Mich 423, 427; 835 NW2d 336 (2013).

Similarly, when interpreting a contract, "it is a court's obligation to determine the intent of the parties by examining the language of the contract according to its plain and ordinary meaning." *In re Smith Trust*, 480 Mich 19, 24; 745 NW2d 754 (2008). Contracts must be read

-10-

"as a whole, giving harmonious effect, if possible, to each word and phrase." *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 50 n 11; 664 NW2d 776 (2003). An interpretation that would "render any part of the contract surplusage or nugatory" must be avoided. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468; 663 NW2d 447 (2003) (quotation marks and citation omitted). Unambiguous contract language must be enforced as written. *In re Smith Trust*, 480 Mich at 24. "However, if the contractual language is ambiguous, extrinsic evidence can be presented to determine the intent of the parties." *Id*.

The special assessment was established by Resolution 96-04, which incorporated terms contained in the VSADA. Under Resolution 96-04, the special assessment roll was confirmed on September 7, 2004. The resolution called for annual interest-only payments, and it deferred the payment of the principal consistent with the terms of the VSADA. The special assessment roll, as confirmed by the resolution, established a term of 10 years, specifying that any "unpaid principal and interest is due in full upon [the] termination date." Thus, as a general proposition, the principal on the special assessment would come due in September 2014. However, as explained earlier, the special assessment roll also makes clear that certain triggering events could result in the principal coming before the termination of the 10-year period. On appeal, plaintiff debates what constitutes a triggering event, and he asserts that triggering events occurred in this case that necessitated payment of the principal before the foreclosure. These arguments are without merit.

First, plaintiff asserts that Resolution 96-04 triggered payment of the entire special assessment, including principal, in the event that the prior owner failed to make annual interest payments. Relevant to plaintiff's argument, Resolution 96-04 states, "The special assessment roll shall be deferred consistent with the terms of the [VSADA] . . . *provided that* annual payments equivalent to the simple interest on any unpaid balance shall be due and payable on the anniversary date of the confirmation of this special assessment roll." Plaintiff interprets this provision to mean that the special assessment shall only be deferred "provided that" the annual interest payments were actually made each year. Because he presented evidence suggesting that the previous owners were delinquent in making their annual interest payments, plaintiff asserts that the deferment provided for in Resolution 96-04 ceased and that the entire special assessment was due before the foreclosure.

Contrary to this argument, the pertinent phrase in Resolution 96-04 is "due and payable," not "paid." In other words, the resolution does not state that payment of the principal is deferred provided that annual payments are actually paid each year. As commonly understood, when something is "due," it is "owed or owing." *Merriam-Webster's Collegiate Dictionary* (11th ed). Likewise, when something is "payable," it is something "that may, can, or must be paid." *Merriam-Webster's Collegiate Dictionary* (11th ed). Undoubtedly, the interest-only payments are "due and payable" annually, and elsewhere in the resolution the City makes plain that penalties for nonpayment of taxes could be assessed if the interest was not paid. But, this "due and payable" language simply distinguishes between the interest-only payments due and payable annually and the principal payment, which was to be deferred consistent with the terms of the VSADA. This establishment of an annual due date for the interest installments does not condition the deferment of the principal on the actual payment of these annual installments. Accordingly, there is no merit to plaintiff's assertion that nonpayment of interest by the previous

owners was a triggering event, and any evidence establishing that the previous owners were delinquent in their payment of interest does not entitle plaintiff to relief on appeal.

Second, plaintiff asserts that a triggering event under the VSADA, specifically "final zoning approval," occurred before foreclosure. In contrast to this conclusion, the trial court concluded that "final zoning approval" referred to "completion of the review" by the planning commission and city staff as required to bring the planned unit development (PUD) zoning into fruition. In our view, considering the phrase "final zoning approval" in context and in light of the VSADA as a whole, the trial court's interpretation is correct.

Resolution 96-04 expressly incorporates certain provisions of the VSADA. For instance, as noted, Resolution 96-04 states that "[t]he special assessment roll shall be deferred consistent with the terms of the [VSADA] . . . ." Additionally, the confirmed special assessment roll attached to Resolution 96-04 provides that "[p]rincipal payments, along with any unpaid simple interest on that portion of the principal, shall be due upon certain governmental approvals being issued consistent with the terms of [the VSADA] . . . ." Because Resolution 96-04 refers to the VSADA for additional terms, it is appropriate to look to the VSADA to determine the rules for deferment of the special assessment and, in particular, the governmental approvals in question. See generally *Forge v Smith*, 458 Mich 198, 207; 580 NW2d 876 (1998) (stating that when a writing incorporates additional terms by reference to another writing, the two should be read together). Under § 2(g)(2)(d) of the VSADA, "[p]rincipal payments, with interest thereon accrued on a pro rata basis, shall be due within 180 days of *final zoning approval for a phase* or upon the City's issuance of a soil erosion permit *for the phase*, whichever is earlier." (Emphasis added).

It is undisputed that the full Ravines project was successfully rezoned from single-family residential to a high-density residential PUD district and that the City approved, with conditions, a preliminary PUD site plan. This rezoning occurred in February 2004, approximately seven months before the passage of Resolution 96-04 and the signing of the VSADA in September 2004. Nevertheless, according to plaintiff, this rezoning was the "final zoning approval," and the rezoning constituted a triggering event for payment of the special assessment. In other words, plaintiff asserts that rezoning and "final zoning approval" are synonymous.

Plaintiff's argument is unpersuasive when the phrase "final zoning approval" is considered in context and in light of the VSADA and Resolution 96-04 as a whole. Plaintiff's proposed interpretation renders all provisions dealing with deferment of the special assessment nugatory because the rezoning occurred *before* the signing of the VSADA and its incorporation in the special assessment by Resolution 96-04. It is evident that the parties were aware of and contemplated that fact because the rezoning is recognized in the recitals to the VSADA. Given that understanding, if rezoning was a triggering event, everything in the VSADA and Resolution 96-04 relating to the deferment of the special assessment—the 10-year term, the interest-only annual payments, the inclusion of a soil erosion permit as an event triggering payment, etc.— would be meaningless because a triggering event occurred before the VSADA and Resolution 96-04 came into being. Rather than referring to a past event that would render all provisions regarding deferment of the special assessment useless, § 2(g)(2)(d) of the VSADA is written in the future tense: the principal payments "shall be due within 180 days of" one of the two triggering events, "whichever is earlier." In other words, the VSADA does not contemplate that

a triggering event had already occurred; rather the parties to the VSADA were concerned with possible future events that would trigger payment of the principal.[5] Read as a whole, it cannot plausibly be concluded that the parties to the VSADA intended the PUD rezoning in February 2004 to be the "final zoning approval" that triggered payment of the special assessment principal.

This conclusion is further supported by the fact that, while plaintiff focuses on the phrase "final zoning approval," the triggering event is actually "final zoning approval *for a phase*." (Emphasis added.) As noted, the parties acknowledged in the VSADA that the entire property had been successfully rezoned, and it is undisputed that the development was a multiphase project. In this context, reference to final zoning approval "for a phase" is significant because it clearly denotes something other than rezoning of the entire project as a whole; it is specific to each phase of the development. The City's zoning ordinance, as it pertains to PUD projects, includes requirements for "Final PUD Plan Review," which must be approved for "each phase" if the PUD is to be built in phases. Kentwood Zoning Ordinance, § 13.06(D)(2). At trial, Terry Schweitzer, the community development director and zoning administrator for the City, described the various stages of review, including rezoning and final site review of PUD projects, that must be taken before actual construction can begin on a project. While plaintiff contends that these various steps are unrelated to "zoning" approval, the requirements relating to final PUD approval, including final approval for "each phase," are part of the City's zoning ordinance and thus reasonably understood as part of zoning approval. See Kentwood Zoning Ordinance, ch 12 and 13. On the whole, the VSADA and Resolution 96-04 are not ambiguous, and the trial court did not err by rejecting plaintiff's assertion that "final zoning approval for each phase" meant rezoning of the entire project, which occurred several months before the creation of the deferred special assessment.

Finally, plaintiff asserts that an invoice from 2012 demonstrates that Shaffer had already been billed for the principal on the special assessment. The document in question reports interest as well as principal being "due." However, even if the document could be read to indicate both the principal and the interest were being billed, this would not necessarily entitle plaintiff to

---

[5] As another example of the incongruity of plaintiff's assertion that the triggering event predated the VSADA, the confirmed special assessment roll attached to Resolution 96-04, includes an attachment the assessment roll incorporates by reference. The document is similar to the one involved in the parties' stipulation and lists various trigger dates with a caveat that the dates "are for demonstration only" and when "actual dates are inserted, the interest is automatically recalculated." Notably, the example date for final zoning approval is August 1, 2007. If rezoning in February 2004 was a triggering event, there would be no need for a sample set of dates because the actual date of the final zoning approval would already be known. Indeed, in a paragraph entitled "*Anticipated* Allocations," Roll A specifies that the "payment amounts actually due will be determined based on the occurrence of certain governmental approvals being issued . . . ." (Emphasis added.) Taken together, the VSADA and Resolution 96-04 clearly support the conclusion that the triggering events were possible future events, not a past occurrence.

relief. The invoice is, at best, evidence that the City billed Shaffer, but it does not conclusively establish that the special assessment was legally due and owing under the terms of the VSADA or Resolution 96-04. In other words, the question of when the special assessment came due is really a matter of interpreting the resolution as well as the VSADA and then discerning whether a triggering event occurred. The invoice does not conclusively resolve this issue, and the trial court did not clearly err by giving the document little or no weight.

In sum, the trial court did not clearly err by rejecting plaintiff's assertion that a triggering event occurred before March 2014. Absent a triggering event, the principal on the special assessment came due in September 2014. And, as a future installment of the special assessment, this obligation survived foreclosure. See MCL 211.78k(5)(c). Consequently, plaintiff is not entitled to relief on appeal.

## V. PLAINTIFF'S PRIOR PAYMENT

Next, plaintiff argues that the trial court erred by failing to order the return of a $30,000 payment he made to the City after receiving a bill for taxes owed pursuant to the special assessment. MCL 211.53a provides:

> Any taxpayer who is assessed and pays taxes in excess of the correct and lawful amount due because of a clerical error or mutual mistake of fact made by the assessing officer and the taxpayer may recover the excess so paid, without interest, if suit is commenced within 3 years from the date of payment, notwithstanding that the payment was not made under protest.

Although plaintiff raised this issue below, the trial court did not expressly address the question of a refund, presumably because it determined that the full principal of the special assessment had not been extinguished by the foreclosure. Because we cannot agree with the trial court's ruling as it relates to Phase 1 for the reasons explained in Part II of this opinion, on remand, the trial court should address plaintiff's entitlement to a refund in the first instance.

## VI. SLANDER OF TITLE

Finally, plaintiff argued in his appellate brief that the trial court erred by granting summary disposition regarding his slander of title claim on the basis of governmental immunity. At oral argument, plaintiff's counsel withdrew this claim of error, acknowledging that it lacked merit in light of this Court's recent decision in *Petersen Financial LLC v Kentwood*, ___ Mich App ___, ___; ___ NW2d ___ (2018) (Docket No. 339399); slip op at 10-11. Accordingly, we will not address this issue.

## VII. CONCLUSION

In sum, the trial court was bound by the parties' factual stipulation regarding the conclusive nature of the trigger dates identified in the stipulated document, although we emphasize that those dates were controlling only as to Phase 1 of the B-4 Neighborhood. According to the stipulated document, any amount of the special assessment balance that was attributable to Phase 1 became due before the foreclosure. That amount was therefore extinguished by the foreclosure under MCL 211.78k(5)(c). Because that amount is not readily

ascertainable from the record, we remand for further proceedings consistent with this opinion. On remand, the trial court should also address in the first instance plaintiff's claim that he was entitled to a refund of the $30,000 he previously made to the City. We affirm in all other respects. We do not retain jurisdiction.

/s/ Michael J. Riordan
/s/ Jane E. Markey
/s/ Anica Letica